**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **OLGA MARTINEZ TORRES, LINDA DAVIS, ANGEL ALBERIO, and FERNANDO POSSO, on Behalf of Themselves and All Others Similarly Situated,** | § § § § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | **Civil Action No.  4:18-cv-00983-O** |
| **AMERICAN AIRLINES, INC., THE EMPLOYEE BENEFITS COMMITTEE, and JOHN/JANE DOES 1-5,** | § § § § § § | |
| **Defendants.** | § | |

## <u>ORDER</u>

Before the Court are Plaintiffs' Motion for Class Certification (ECF No. 50), filed December 2, 2019; Memorandum of Law and Appendix in Support (ECF Nos. 51–52), filed December 2, 2019; Defendants American Airlines, Inc. and the Employee Benefits Committee's Opposition to Motion for Class Certification and Memorandum of Law in Support (ECF No. 57), filed January 17, 2020; Appendix in Support of Defendants' Opposition (ECF No. 58), filed January 17, 2020; Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Class Certification (ECF No. 59), filed January 31, 2010; Appendix in Support of Reply Memorandum (ECF No. 60), filed January 31, 2010; Joint Statement of Stipulated and Disputed Facts Relevant to Rule 23 Issues (ECF No. 61), filed February 11, 2020; Plaintiffs' Supplemental Memorandum of Law (ECF No. 71), filed May 14, 2020; and Defendants' Supplemental Brief (ECF No. 72), filed May 14, 2020. Having reviewed the motion, legal briefing, pleadings, evidence, record, and applicable law, Plaintiffs' Motion for Class Certification (ECF No. 50) is **DENIED**.

## I.       BACKGROUND

This putative class action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"), and concerns ERISA's requirement that retirees who select joint and survivor annuities receive a benefit that is no less than the "actuarial equivalent" of the single life annuity ("SLA") they could have selected. The Court assumes the parties' familiarity with the background facts and procedural history set forth in its prior opinion. *See Torres v. Am. Airlines, Inc.*, 416 F. Supp. 3d 640 (N.D. Tex. 2019) (O'Connor, J.) ("*Torres I*").

Plaintiffs Olga Martinez ("Martinez"), Linda Davis ("Davis"), Angel Alberio ("Alberio"), and Fernando Posso ("Posso") (collectively, "Plaintiffs") are participants and beneficiaries of various defined benefit retirement plans sponsored by Defendant American Airlines, Inc. ("American") and administered by Defendant Employee Benefits Committee (the "Committee") (collectively, "Defendants"). As summarized in *Torres I*, Plaintiffs allege Defendants pay retirees who select optional forms of pension benefit payments less than the actuarial equivalent of their accrued benefits in violation of ERISA, which requires that optional forms of benefits be "actuarially equivalent" to an SLA. *See* ERISA § 205(d)(1)(B), (d)(2)(A)(ii), 29 U.S.C. § 1055(d)(1)(B), (d)(2)(A)(ii). Plaintiffs contend that Defendants pay them less than ERISA requires because they incorrectly calculate Plaintiffs' retirement benefits. Plaintiffs' case rests on three basic assertions: (i) the longer a person's life expectancy, the more a retirement plan has to pay the person or his beneficiary; (ii) life expectancies have increased over the last several decades; and (iii) Defendants shortchange retirees and their beneficiaries by using outdated—and therefore shorter—life expectancies. Plaintiffs contend that by using a mortality table from 1984 to determine present-day life expectancies, Defendants improperly decrease the amount they pay in various annuities under the retirement plans.

2

As explained in *Torres I*, Plaintiffs, on behalf of themselves and other similarly situated plan participants, bring three claims for relief based on Defendants' alleged violations of ERISA. First, they seek declaratory and equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), which permits a plan participant to bring a civil action to redress ERISA violations ("Count One").[1] Specifically, Plaintiffs seek declaratory relief that the plans' established methodologies for calculating actuarial equivalence of optional forms of benefits violate ERISA because they do not provide an actuarially equivalent benefit which, concomitantly, results in a violation ERISA's anti-forfeiture clause under ERISA § 203(a), 29 U.S.C. § 1053(a). Second, they bring a claim under ERISA § 502(a)(1), 29 U.S.C. § 1132(a)(3), for "reformation" of the plans, requesting an order requiring the plans to update their mortality tables and discount rates so they provide actuarially equivalent benefits as required by ERISA ("Count Two"). Finally, they bring a claim for breach of fiduciary duty under ERISA §§ 1104 and 502(a)(3), 29 U.S.C. §§ 1104, 1132(a)(3), against the Committee and American for, among other things, failure to update the plans' actuarial assumptions ("Count Three"). In addition to seeking declaratory, equitable, and injunctive relief, Plaintiffs seek a recalculation and correction of benefits previously paid and disgorgement of amounts improperly withheld. *See Torres I*, 416 F. Supp. 3d at 645 (summarizing Plaintiffs' claims).

On February 12, 2019, Defendants filed a motion to dismiss Plaintiffs' Complaint under Federal Rule of Civil Procedure 12(b)(6), contending that the plans comply with ERISA's statutory and regulatory provisions and that their use of a mortality table from 1984 was reasonable as a matter of law. On August 7, 2019, the Court denied Defendants' motion to dismiss after concluding

---

[1] ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

that "Plaintiffs have made sufficient factual allegations to allege a plausible claim that Defendants have violated ERISA." *Id.* at 651.

On December 2, 2019, Plaintiffs filed their Motion for Class Certification. They seek to certify a class of claims based on the overarching contention that Defendants paid, and are paying, monthly retirement benefits for certain participants and beneficiaries in three benefit pension plans ("Plans") that are lower than they should be. Defendants oppose Plaintiffs' motion, arguing that a fundamental conflict between the representative Plaintiffs and some absent class members renders the representative Plaintiffs inadequate representatives of the class.

### A.  Retirement Benefits under ERISA

"Congress enacted ERISA to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans and to 'provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quoting 29 U.S.C. § 1001(b)). "The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans." *Id.*

Pension plans governed by ERISA must offer an SLA for unmarried participants, "unless another form of benefit is elected by the participant." 26 C.F.R. § 1.401(a)-20, at A-25. An SLA is a fixed monthly payment that the individual will receive after retirement for the remainder of his or her life. For married participants, the default form of benefit is a joint and survivor annuity ("JSA"). *See* 29 U.S.C. § 1055(a)–(b). When a participant in a defined benefit pension plan is given a choice between taking pension benefits as an SLA or an optional form of benefit, such as a JSA, the optional form of benefit must be so calculated as to be the actuarial equivalent of the amount the participant would have earned under an SLA. *See* ERISA § 205(d)(1)(B), (d)(2)(A)(ii),

29 U.S.C. § 1055(d)(1)(B), (d)(2)(A)(ii); 26 U.S.C. § 417(b); *see also* 26 C.F.R. §§ 1.401(a)-11(b)(2), 1.401(a)-20, at A-16 (requiring that a JSA "be at least as valuable as any other optional form of benefit payable under the plan at the same time"). "Actuarial equivalence" under ERISA is a term of art with an established meaning. *Torres I*, 416 F. Supp. 3d at 647 (citing *Stephens v. U.S. Airways Grp., Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011)). "[M]odes of payment are actuarially equivalent when their present values are equal under a given set of actuarial assumptions." *Stephens*, 644 F.3d at 440.

Converting an SLA to an optional form of benefit involves two variables, namely, life expectancy assumptions as set forth in a mortality table and an interest rate used to assume how rapidly the value of money will increase in the future. *Torres I*, 416 F. Supp. 3d at 643. Treasury Department regulations require employers to use "reasonable" actuarial assumptions to determine actuarial equivalence. *See, e.g.*, 26 C.F.R. § 1.401(a)-11(b)(2) (providing, for JSAs, that equivalence "be determined[] on the basis of consistently applied reasonable actuarial factors"); *id.* § 1.411(d)-3(g)(1) (requiring that actuarial present value be "determined using reasonable actuarial assumptions").

### B.  The Plans

The Plans are (i) the Retirement Benefit Plan of American Airlines, Inc. for Employees Represented by the Transport Workers Union of America, AFL-CIO ("TWU Plan"); (ii) the Retirement Benefit Plan of American Airlines, Inc. for Flight Attendants (the "FA Plan"); and (iii) the Retirement Benefit Plan of American Airlines, Inc. for Agent, Management, Specialist, Support Personnel and Officers (the "AMS Plan"). Declaration of Douglas P. Needham. ("Needham Decl."), ECF No. 52-1, at Ex. 2 (2009 TWU Plan); Ex. 5 (2014 TWU Plan); Ex. 3 (2009 FA Plan); Ex. 6 (2014 FA Plan); Ex. 4 (2009 AMS Plan); Ex. 7 (2014 AMS Plan). With

respect to each of the Plans, American is the sponsor and the Committee is the administrator. *Id.* at Ex. 2 (2009 TWU Plan, at §§ 11.3, 11.8); Ex. 5 (2014 TWU Plan at §§ 11.3, 11.8); Ex. 3 (2009 FA Plan at §§ 11.3, 11.8); Ex. 6 (2014 FA Plan at §§ 11.3, 11.8); Ex. 4 (2009 AMS Plan at §§ 10.3, 10.8); and Ex. 7 (2014 AMS Plan at §§ 10.3, 10.8); *see also* Defs.' Answer 19, ECF No. 38.

Each of the Plans provides that an SLA is the normal form of benefit for an unmarried participant,[2] while a QJSA is the normal form of benefit for a married participant. Needham Decl. at Ex. 2 (2009 TWU Plan, at § 9.2); Ex. 5 (2014 TWU Plan, at § 9.2); Ex. 3 (2009 FA Plan, at § 9.2); Ex. 6 (2014 FA Plan, at § 9.2); Ex. 4 (2009 AMS Plan, at § 8.2); and Ex. 7 (2014 AMS Plan, at § 8.2).

The QJSA for each of the Plans pays actuarially reduced benefits during the joint lives of the Plan participant and his or her eligible spouse, and 50% of that benefit to the spouse for life if he or she outlives the participant (known as a "50% JSA"). *Id.* at Ex. 2 (2009 TWU Plan, at § 9.2(a)); Ex. 5 (2014 TWU Plan, at § 9.2(a)); Ex. 3 (2009 FA Plan, at § 9.2(a)); Ex. 6 (2014 FA Plan, at § 9.2(a)); Ex. 4 (2009 AMS Plan, at § 8.2(a)); and Ex. 7 (2014 AMS Plan, at § 8.2(a)).[3]

The Plans have identical provisions relating to QPSAs. The surviving spouse is entitled to receive the benefits that he or she would have been entitled to receive if the participant had selected the QJSA, commencing on the date that the deceased participant would have attained the earliest

---

[2] Under Section 2.1 of each of the Plans, a participant's "Accrued Benefit" is "calculated . . . and payable as a Single Life Annuity . . . ." Needham Decl. at Ex. 2 (2009 TWU Plan, at § 2.1); Ex. 5 (2014 TWU Plan, at § 2.1); Ex. 3 (2009 FA Plan, at § 2.1); Ex. 6 (2014 FA Plan, at § 2.1); Ex. 4 (2009 AMS Plan, at § 2.1); and Ex. 7 (2014 AMS Plan, at § 2.1).

[3] Each of the Plans offers three other options for joint and survivor annuities: a 66 2/3% JSA, a 75% JSA and a 100% JSA. Needham Decl. at Ex. 2 (2009 TWU Plan, at § 9.4(b)(i)); Ex. 5 (2014 TWU Plan, at § 9.4(b)(i)); Ex. 3 (2009 FA Plan, at § 9.4(b)(i)); Ex. 6 (2014 FA Plan, at § 9.4(b)(i)); Ex. 4 (2009 AMS Plan, at § 8.4(b)(i)); and Ex. 7 (2014 AMS Plan, at § 8.4(b)(i)). Each of the Plans designate the 75% JSA as the "Qualified Optional Survivor Annuity." *Id.* at Ex. 2 (2009 TWU Plan, at § 2.79); Ex. 5 (2014 TWU Plan, at § 2.79); Ex. 3 (2009 FA Plan, at § 2.79); Ex. 6 (2014 FA Plan, at § 2.79); Ex. 4 (2009 AMS Plan, at § 2.80); and Ex. 7 (2014 AMS Plan, at § 2.80).

retirement age permitted under the Plan. *Id.* at Ex. 2 (2009 TWU Plan, at § 2.80(b)); Ex. 5 (2014 TWU Plan, at § 2.80(b)); Ex. 3 (2009 FA Plan, at § 2.80(b)); Ex. 6 (2014 FA Plan, at § 2.80(b)); Ex. 4 (2009 AMS Plan, at § 2.81(b)); and Ex. 7 (2014 AMS Plan, at § 2.81(b)).

The Plans also offer identical "Guaranteed Period Annuity Options," also known as certain and life annuities" ("CLAs"). With a CLA, participants receive a reduced annuity, payable to the participant for life; but if the participant dies before receiving a certain number of guaranteed payments, the participant's designated beneficiary will receive the remainder of the guaranteed payments. The Plans all provide three CLA options with the same guaranteed payment periods— 120, 180 and 240 months (10, 15 or 20 years). *Id.* at Ex. 2 (2009 TWU Plan, at § 9.4(b)(iii)); Ex. 5 (2014 TWU Plan, at § 9.4(b)(iii)); Ex. 3 (2009 FA Plan, at § 9.4(b)(iii)); Ex. 6 (2014 FA Plan, at § 9.4(b)(iii)); Ex. 4 (2009 AMS Plan, at § 8.4(b)(iii)); and Ex. 7 (2014 AMS Plan, at § 8.4(b)(iii)).

Of particular import to this dispute, each of the Plans provides that "Actuarial Equivalent" or "Actuarial Equivalency" means "equality in value of the aggregate amounts expected to be received as a benefit under the Plan under different forms of payment based upon actuarial factors and assumptions" set out in the Plan. *Id.* at Ex. 2 (2009 TWU Plan, at § 2.3); Ex. 5 (2014 TWU Plan, at § 2.3); Ex. 3 (2009 FA Plan, at § 2.3); Ex. 6 (2014 FA Plan, at § 2.3); Ex. 4 (2009 AMS Plan, at § 2.3); and Ex. 7 (2014 AMS Plan, at § 2.3). Each of the Plans employs the same two actuarial assumptions—a 5% interest rate and the UP-1984 mortality table, weighted 88% male and 12% female—to calculate actuarial equivalence for QJSAs, QOSAs, QPSAs and CLAs. *Id.* at Ex. 2 (2009 TWU Plan, at § 2.3); Ex. 5 (2014 TWU Plan, at § 2.3); Ex. 3 (2009 FA Plan, at § 2.3); Ex. 6 (2014 FA Plan, at § 2.3); Ex. 4 (2009 AMS Plan, at § 2.3); and Ex. 7 (2014 AMS Plan, at § 2.3).

"Actuarial Equivalent," as defined above, is used in Section 9.4 of each of the Plans to calculate the "Optional Forms of Benefits" (QJSAs, QOSAs, QPSAs and CLAs). *Id.* at Ex. 2 (2009 TWU Plan, at § 9.4); Ex. 5 (2014 TWU Plan, at § 9.4); Ex. 3 (2009 FA Plan, at § 9.4); Ex. 6 (2014 FA Plan, at § 9.4); Ex. 4 (2009 AMS Plan, at § 9.4); and Ex. 7 (2014 AMS Plan, at § 9.4). "Actuarial Equivalent" is also used in Section 7.3 of each of the Plans to determine "Late Retirement Benefits." *Id.* at Ex. 2 (2009 TWU Plan, at § 7.3); Ex. 5 (2014 TWU Plan, at § 7.3); Ex. 3 (2009 FA Plan, at § 7.3); Ex. 6 (2014 FA Plan, at § 7.3); Ex. 4 (2009 AMS Plan, at § 7.3); and Ex. 7 (2014 AMS Plan, at § 7.3).[4]

### C.  The Representative Plaintiffs

Representative Plaintiff Torres is a beneficiary of the TWU Plan. Her late husband worked for American from 1990 to 2018, when he passed away. *Id.* at Ex. 16 (Declaration of Olga Martinez Torres ¶¶ 1–2). Under the terms of the TWU Plan, Torres has been receiving a QJSA survivor annuity in the form of a 50% JSA since her husband's death. *Id.* at Ex. 15 (Declaration of Mitchell L. Serota at 29) ("Serota Decl."). Plaintiff Davis is also a beneficiary of the TWU Plan. Her late husband worked for American from 1990 until he passed away in May 2016. *Id.* at Ex. 17 (Declaration of Linda Davis ¶ 2). Under the terms of the TWU Plan, Davis has been receiving an enhanced QPSA survivor annuity in the form of a 100% JSA since June 1, 2016. *Id.* at Ex. 15 (Serota Decl. at 27).  Plaintiff Alberio is a retired plan participant who (along with his spouse)

---

[4] The Plans provide for increased monthly benefits for a late retiree, someone who retires after April 1 following the date he or she reaches age 70½. Under Section 7.3(a)(ii) of the Plans, that compensation is provided in the form of a "Late Retirement Benefit," which is the "Actuarial Equivalent of the value of such Member's benefit as of the last date in which the Member accrued a benefit." The reason for the increase is that a late retiree will draw benefits for a shorter period, so each monthly payment is increased to compensate. *See* 25 No. 1 Pension Plan Fix-It Handbook Newsl. 4 (2017) ("Actuarial equivalence mathematics are flipped for late retirements, and the pensions are increased to reflect the expectation that they will be paid out over a shorter period of time.").

selected the QJSA when he retired following an injury. *Id.* at Ex. 18 (Declaration of Angel Alberio ¶ 2). Plaintiff Posso is a retired plan participant who selected the 120-month CLA when he retired in January 2013. *Id.* at Ex. 19 (Declaration of Fernando Posso ¶ 3).

The proposed Class includes participants and beneficiaries of the Plans receiving: (a) the Plans' designated QJSA, which is a 50% JSA, the 75% JSA that the Plans designated as their QOSA, and the other optional JSAs offered under the Plans (a 66 and 2/3% JSA and a 100% JSA); (b) those receiving a survivor benefit under of the Plans' QPSA; and (c) those receiving benefits in the form of a CLA. *See* Pls.' Mem. Supp. Mot. Class Cert. 2, ECF No. 51.

### D.  Dr. Serota's Report and Conclusions

Plaintiffs offer the expert report of Dr. Mitchell I. Serota ("Dr. Serota"), an actuarial expert, with respect to two primary issues: (a) whether the Plans' actuarial assumptions are reasonable; and (b) whether the benefits calculated using those assumptions are lower than they would be if the Plans used what he considers to be reasonable actuarial assumptions. *Id.* at Ex. 15 (Serota Decl.).[5] To address the first issue, Dr. Serota evaluates the reasonableness of the Plans' mortality table (the UP-1984 Table) based on the standards in the Actuarial Standards of Practice #35 ("ASOP 35") for selecting demographic and mortality assumptions when measuring pension liabilities. For the second issue, he compares the benefits that the representative Plaintiffs have received, and are receiving, to what they would receive if benefits were calculated using reasonable assumptions. Using information about each representative Plaintiffs' benefits (such as the amount each would have received as an SLA and the amount each is receiving as an optional form of benefit), as well as pertinent actuarial and demographic data (such as gender, years of service, and

---

[5] Dr. Serota has been a member of the American Academy of Actuaries ("AAA") for forty years, and, since 1983, both an Enrolled Actuary and a Fellow of the Society of Actuaries. Needham Decl. at Ex. 15, Serota Decl. at 29. Defendants do not challenge his expertise or qualifications to draw the opinions he provided in support of this motion.

age when benefits were calculated), Dr. Serota constructed a database that allowed him to compare the representative Plaintiffs' benefits calculated under the Plans' actuarial assumptions to what their benefits would be if calculated with different assumptions. These different assumptions include using the applicable mortality table for the year in which the benefits began (rather than the UP-1984 table), and an interest rate based on the interest rate American used in its annual audited financial statements, which ranges from 3.80% to 5.20% depending on the year examined between 2011 and 2018 (rather than the 5% interest rate specified in the Plans).

Based on his models, Dr. Serota concludes:

> The Plans have systematically provided optional benefits to retiring plan participants that are not truly actuarially equivalent to the normal retirement benefit available under the Plans, in this case a single life annuity ("SLA"). By using antiquated mortality tables, the Plans have instead provided options that are of less value than the SLA. These markedly reduced benefits cause beneficiaries to subsidize the funding of the Plans.

> In the case of the defined benefit plans sponsored by American Airlines, neither up-to-date nor market-value-based assumptions are used in calculating actuarial equivalence. The disconnection between using unreasonable assumptions for calculating benefit options but using reasonable assumptions for audited financial statements is further evidence to support the Plaintiffs' case.

*Id.* at Ex. 15 (Serota Decl. at 4). As to the representative Plaintiffs, Dr. Serota opines:

> I have every reason to expect that these four are indicative of the set of all participants who retired from one of the three Plans with an optional form of benefit. That is, I maintain that anyone who elected a JSA, QPSA or CLA from 2012 to the present would have received a larger monthly benefit if reasonable actuarial assumptions had been employed.

*Id.* at Ex. 15 (Serota Decl. at 27).

### E.  The Proposed Class Definition

Plaintiffs maintain that their claims are appropriate for class action status because Defendants use the same mortality table and interest rate to calculate the same types of benefits

for all members of the class they seek to certify. Plaintiffs now move to certify a class consisting of:

> All participants or beneficiaries of the Retirement Benefit Plan of American Airlines, Inc. for Employees Represented by the Transport Workers Union of America, AFL-CIO, the Retirement Benefit Plan of American Airlines, Inc. for Agent, Management, Specialist, Support Personnel and Officers, and the Retirement Benefit Plan of American Airlines, Inc. for Flight Attendants, who began receiving pension benefits on or after December 11, 2012, in any form other than (a) a straight single-life annuity; (b) a lumpsum payment; or (c) an installment of fixed payments over a period certain. Excluded from the Class are Defendants and any individuals who are subsequently determined to be fiduciaries of the Plans.

Pls.' Mem. Supp. Mot. Class Cert. 4, ECF No. 51. Defendants oppose Plaintiffs' motion.

## II.    LEGAL STANDARD FOR CLASS CERTIFICATION

The class action is "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). Federal Rule of Civil Procedure 23 governs whether a proposed class falls within this limited exception. The parties seeking class certification "bear the burden of proof to establish that the proposed class satisfies the requirements of Rule 23." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012).

"To obtain class certification, parties must satisfy Federal Rule of Civil Procedure 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)." *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 252 (5th Cir. 2020) (internal brackets omitted) (citations omitted); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–14 (1997). Rule 23(a)'s four threshold requirements are:

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)     the representative parties will fairly and adequately protect the interests of
the class.

FED. R. CIV. P. 23(a). These four threshold conditions are "commonly known as 'numerosity, commonality, typicality, and adequacy of representation.'" *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 766 (5th Cir. 2020) (quoting FED. R. CIV. P. 23(a)). In addition to satisfying Rule 23(a)'s requirements, a class plaintiff must also satisfy one Rule 23(b) requirement. Plaintiffs seek to certify the class pursuant to either Rule 23(b)(1)(A) or Rule 23(b)(2). Rule 23(b)(1)(A) is satisfied where "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." FED. R. CIV. P. 23(b)(1)(A). Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2).

"Given the impact of certification, district courts must analyze Rule 23 with special attention." *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 2020 WL 2046545, at *2 (5th Cir. Apr. 29, 2020). Class certification requires more than merely pleading class claims.

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc. . . . . "[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and [ ] certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. "[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."

*Dukes*, 564 U.S. at 350–52 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (original emphasis)). The Court should "seek to understand the claims, defenses, relevant facts,

and applicable substantive law in order to make a meaningful determination of the certification issues." *Flecha*, 946 F.3d at 766 (citation omitted). "'If some of the determinations . . . cannot be made without a look at the facts, then the judge must undertake that investigation.'" *Chavez*, 2020 WL 2046545, at *2 (quoting *Spano v. Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011)). "The judge cannot merely review a complaint and ask whether, taking the facts as the party seeking the class presents them, the case *seems* suitable for class treatment. Much more is needed." *Id.* (original emphasis) (citation omitted). In *Chavez*, the Fifth Circuit summarized why rigorous analysis of Rule 23's requirements is necessary:

> It is no secret that certification can coerce a defendant into settling on highly disadvantageous terms regardless of the merits of the suit. And the existence of a class fundamentally alters the rights of present and absent members, particularly for mandatory classes such as the one here. No less than due process is implicated, so a careful look is necessary.

*Id.* at *3 (internal quotation marks, citations, and footnotes omitted).

While the district court must perform a "rigorous analysis" to determine whether to certify a class, it may not require a plaintiff to establish his claims at the class certification stage. *Dukes*, 564 U.S. at 351; *see also Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merit questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." (citation omitted)).

"Notably, the obligation of a district court to conduct a rigorous analysis of Rule 23's requirements, as evidenced by written reasons for certification, is not dispensed with by the parties' stipulation to certification or failure to contest one or more of Rule 23's requirements, since 'the court [is] bound to conduct its *own* thorough . . . inquiry.'" *Ward v. Hellerstedt*, 753 F. App'x 236,

244 (5th Cir. 2018) (quoting *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 n.7 (5th Cir. 2002) (original emphasis)). Such independent analysis is necessary to "protect unknown or unnamed potential class members [who], . . . by definition. . . do not and cannot participate in any stipulations concocted by the named parties." *Id.* (internal quotation marks and citation omitted); *see also* 3 William B. Rubenstein, NEWBERG ON CLASS ACTIONS § 7:19 (5th ed. 2013) ("NEWBERG ON CLASS ACTIONS") ("If the defendant does not contest a prong of the certification analysis, or if the parties stipulate to particular issues, the court must nonetheless independently find that the plaintiff has satisfied that requirement.").

Finally, the Court must consider general prerequisites to certification such as whether the proposed class definitions are appropriate, whether the named representatives are members of the class, and whether they have standing. *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) ("[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members."(citation omitted)); *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001) ("Standing is an inherent prerequisite to the class certification inquiry.").

## III.   ANALYSIS

### A. Rule 23(a)—Class Action Prerequisites

Defendants stipulate that Plaintiffs have satisfied Federal Rule of Civil Procedure 23(a)(1)'s numerosity requirement, Rule 23(a)(2)'s commonality requirement, and Rule 23(a)(3)'s typicality requirement, as well as the requirement of Rule 23(a)(4) that counsel adequately represent the class. *See* Joint Statement of Stipulated & Disputed Facts Relevant to Rule 23 Issues, ECF No. 61. Defendants do, however, challenge the adequacy of the representative Plaintiffs under Rule 23(a)(4). Because the Court concludes that Plaintiffs have failed to meet their burden under

Rule 23(a)(4) to demonstrate they are adequate representatives of the class, the Court need not analyze numerosity, commonality, typicality, or the adequacy of counsel. *See Ward*, 753 F. App'x at 244 (stating that rigorous analysis is needed even when the class is not challenged or the parties stipulate to it).

To comply with the requirements of Rule 23(a)(4), the movant must show that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). This requirement is met when (1) class counsel prosecute the action zealously and competently; (2) representative parties are willing and able to take an active role in and control the litigation and protect the interests of absentee class members; and (3) there are no conflicts of interest between the representative parties and the class members. *See Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017). The adequacy inquiry of Rule 23(a)(4) "serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent." *Amchem Prods.*, 521 U.S. at 625. As explained by the Fifth Circuit:

> [B]ecause absent class members are conclusively bound by the judgment in any class action brought on their behalf, the court must be especially vigilant to ensure that the due process rights of all class members are safeguarded through adequate representation at all times. Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only where those differences create conflicts between the named plaintiffs' and the class members' interests.

*Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 480 (5th Cir. 2001) (internal footnotes and citations omitted); *see also Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986) (considering, in evaluating the requirement of adequate representation, whether named plaintiffs have "an insufficient stake in the outcome *or interests antagonistic to the unnamed members*" (emphasis added)); *see generally Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) ("[T]he Due Process Clause of course requires that the named plaintiff at all times adequately

represent the interests of the absent class members."); *Chavez*, 2020 WL 2046545, at *3 ("[T]he existence of a class fundamentally alters the rights of present and absent members, particularly for mandatory classes such as the one here. No less than due process is implicated, so a careful look is necessary." (internal quotation marks, citations, and footnotes omitted)). "Adequacy [under Rule 23] is for the plaintiffs to demonstrate; it is not up to defendants to disprove the presumption of adequacy." *Berger*, 257 F.3d at 481.

With respect to Rule 23(a)(4), Plaintiffs assert in support of their motion: "Finally, the proposed Class representatives have no conflicts of interest with the other members of the Class. Their claims rise and fall on the same facts and legal theories as all other members of the Class, and their diverse experiences further ensure that all class members will be well-represented." Pls.' Mem. Supp. Mot. Class Cert. 15, ECF No. 51. Defendants counter that this "bald proclamation offers no substantive examination of adequacy of representation and fails to address that class members have conflicting interests in how the legal theories are presented and resolved." Defs.' Opp'n Mem. 5, ECF No. 57. "Despite the importance of this precondition to class certification, Plaintiffs do not even legitimately attempt to demonstrate any alignment of their interests with those of the putative class members." *Id.* Further, Defendants contend that "Plaintiffs flunk the adequacy requirement because the relief they seek would affirmatively—and necessarily—harm some absent class members that they purport to represent." *Id.* at 6. Specifically, Defendants argue Plaintiffs are not adequate representatives under Rule 23(a)(4) because (i) the relief they seek— reforming the definition of "Actuarial Equivalent" in the Plans—would harm some class members they seek to represent; and (ii) use of alternative discount rates to fashion the relief Plaintiffs seek would harm some class members they purport to represent. The Court considers these potential conflicts in turn.

### 1. *Reforming the Plans' Actuarial Table to Calculate Optional Forms of Benefits*

Defendants argue that the precise relief Plaintiffs seek—reforming the definition of "Actuarial Equivalent" in a manner that, for any given SLA, would increase the life expectancy assumptions in the mortality table and, thereby, the value of the Plans' optional forms of benefits— would harm some class members they seek to represent. In support, Defendants rely on the plain language of the Plans, the Declaration of Jane Urbis, and the report from their expert, Jack Abraham ("Abraham").[6]

First, Defendants maintain:

> Plaintiffs ignore that the mortality table and discount rate contained in the definition of "Actuarial Equivalent" [in § 2.3 of the Plans] do more than simply convert a single life annuity to alternative forms of benefit. These same actuarial assumptions are also used to calculate "Late Retirement Benefits," [under § 7.3 of the Plans] a benefit enhancement required for those participants who work past a certain age.

Defs.' Opp'n Mem. 2, ECF No. 57 (emphasis added). Defendants and Abraham fault Plaintiffs and Dr. Serota for using a model that proposes using a new, preferred mortality table to calculate the "Actuarial Equivalent" of a single life annuity under section 9.4(a) of the Plans—which Plaintiffs term a "horizontal" conversion—but retaining the *existing* UP-1984 mortality tables that appear in the Plans' current definition of "Actuarial Equivalent" when determining a participant's Late Retirement Benefit under section 7.3 of the Plans—which Plaintiffs term a "vertical" conversion. *See id.* at 9 ("Whether the inconsistency is the result of intentional sleight of hand or

---

[6] Abraham is a Principal at PricewaterhouseCoopers LLP in the People and Organization Practice and a Fellow of the Society of Actuaries, a Member of the American Academy of Actuaries, and an Enrolled Actuary. Defs.' App. in Supp. Opp'n Mem. at Ex. A (Expert Report of Jack Abraham), ECF No. 57. Plaintiffs do not challenge his expertise or qualifications to draw the opinions he has provided in response to this motion.

carelessness, the bottom line is that, obviously, the same defined Plan term cannot mean two different things in different parts of the Plan.").

In addition to emphasizing that the relief Plaintiffs seek would result in the same defined Plan term, "Actuarial Equivalent," meaning two different things in different sections of the Plan, relying on Abraham's report, Defendants argue:

> Adopting Plaintiffs' proposed new mortality table for the Plans' single definition of "Actuarial Equivalent" would *decrease* the value of Late Retirement Benefits for certain absent class members, and would therefore result in a decrease in benefits for certain absent class members overall. This is an obvious conflict of interest between the named Plaintiffs and absent class members that on its face precludes class certification.

*Id.* at 2–3 (original emphasis). Defendants therefore contend that "any Plan participant born before November 1, 1941; retired on or after July 1, 2015; and, elected a 50% [JSA] would suffer a reduction in benefits under the consistent application of the factors set forth in Serota's declaration." *Id.* at 9. Defendants have provided the Court with a Declaration from Jane Urbis ("Urbis"), the Senior Manager, Retirement/Pension Administration, in the benefits department for American. Defs.' App. in Supp. Opp'n Mem. at Ex. B (Declaration of Jane Urbis) ("Urbis Decl."). In her Declaration, Urbis states she has reviewed American's corporate records and "determined that there are participants in the Plans who were born before November 1, 1941; retired on or after July 1, 2015; and, elected a 50% [JSA]." *Id.* at Ex. B (Urbis Decl. ¶ 3).

Abraham explains this conflict in his report as follows:

> 25. Under the Plans' terms, the same mortality rate assumptions (UP-84, blended 88% male and 12% female and a discount rate of 5%) are used for both actuarial adjustments (i.e. the Late Retirement Benefit adjustment and the alternative form of benefit adjustment). In contrast, while the Serota Declaration replaces the Plans' mortality rate assumption with its own handpicked assumption when converting Mr. Posso's benefit from a single life annuity to a CLA, it uses exactly the same Late Retirement Benefit as calculated by the Plan, and so therefore retains the Plans' mortality rate assumption (i.e., the assumption that Plaintiffs

characterize as "antiquated" and "unreasonable") in calculating Mr. Posso's Late Retirement Benefit.

26. The Serota Declaration's inconsistency in substituting its own mortality rate assumption for the Plans' assumptions artificially skews its calculations. The use of a mortality table with longer life expectancies than the Plans' mortality rate (as urged by Plaintiffs) reduces an individual's single life annuity Late Retirement Benefit. The Serota Declaration calculation improperly avoids that reduction by retaining the Plans' mortality table for determining the single life annuity Late Retirement Benefit, while replacing the Plans' mortality table when converting that single life annuity Late Retirement Benefit to the optional form elected by Mr. Posso.

27. A simplified example can be used to explain why using the Plans' factors that are based on a shorter life expectancy result in a larger Late Retirement Benefit than the assumptions in the Serota Declaration. For purposes of this example, I ignore the impact of interest and round the factors to the nearest year. Under the assumptions proposed in the Serota Declaration, a 73-year-old is expected to live 15 years to age 88. For this example, the 73-year-old is assumed to be entitled to a benefit of $1,000 a year.

    a.  Over the participant's lifetime, he is expected to receive $15,000.

    b.  If instead of commencing benefits at age 73, he waits until age 74, he is expected to only receive 14 payments. Accordingly, the annual payment should be actuarially increased by a factor of 15 divided by 14 to $1,071.43 so that over the participant's remaining lifetime he would still be expected to receive $15,000.

28. The mortality table in the Plans, however, specifies a shorter life expectancy, here simplified to approximately 10 years. The impact of a shorter life expectancy is a larger actuarial increase factor and, therefore, an increased Late Retirement Benefit. This is because missing out on one year's payments results in the loss of a larger percent of the total expected payments, and any increases applied will be expected to be paid to the participant over a shorter period.

29. Taking the example above, under the Plans' factors, the 73-year-old is expected to receive $10,000 over his lifetime. If he waits until age 74, he will now receive an actuarial increase of 10 divided by 9, which equals an annual benefit of $1,111.11. This amount is greater than the amount the participant would have received of $1,071.43 if the Serota Declaration's proposed mortality tables were applied. The Late Retirement Benefit is greater under the Plans' factors than under the assumptions proposed in the Serota Declaration, as shown in Table I below, and the difference compounds the later a participant retires.

*Id.* at Ex. A (Expert Report of Jack Abraham ¶¶ 25–29) ("Abraham Report") (internal footnotes and tables omitted). On this basis, Abraham concludes that "the Serota Declaration's conjecture that the use of the specified alternate mortality rate assumptions would have resulted in larger monthly benefit payments for any individual who elected a JSA, QPSA or CLA from 2012 to the present is unsupported and demonstrably wrong." *Id.* at Ex. A (Abraham Report ¶ 40).[7]

In their reply brief, Plaintiffs, relying on a supplemental declaration of Dr. Serota, argue that ERISA does not require pension plans to use the same actuarial assumptions for calculating the amount of a subsidy for a participant who takes late retirement, a so-called "vertical" conversion, with the actuarial assumptions used for calculating the actuarial equivalence of optional forms of benefits, a so-called "horizontal" conversion. Pls.' Reply 3, ECF No. 59. Plaintiffs assert they do not challenge the former, but only the latter. Plaintiffs contend the "Plans can be reformed to address the horizontal violation without changing the formulae for vertical conversions, and as Dr. Serota testified (without contradiction from Defendants), all members of the proposed Class would be better off if the Plans used updated actuarial assumptions for horizontal conversions." *Id.* at 4, ECF No. 59.[8]

Having considered the legal briefing and supporting evidence, as well as applicable law, the Court concludes that the representative Plaintiffs have failed to satisfy their burden under Rule 23(a)(4) to show they are adequate representatives of the class they seek to represent. Specifically,

---

[7] The Court's discussion of Abraham's report is not exhaustive of his models and calculations, but is sufficient for purposes of this motion. Abraham provides several more examples of calculations demonstrating that consistent application of the alternate mortality assumptions proposed by Plaintiffs and contained in Dr. Serota's report (replacing shorter life expectancies with longer life expectancies) would result in a net loss to certain members of the proposed class.

[8] On May 8, 2020, the Court ordered supplemental briefing on the issues presented. *See* Order, ECF No. 70. On May 14, 2020, the parties submitted supplemental briefing, *see* ECF Nos. 71, 72, which the Court has considered in deciding the Motion for Class Certification.

the relief they seek—reforming the definition of "Actuarial Equivalent" in the Plans—would harm some class members they seek to represent, including participants in the Plans who were born before November 1, 1941, retired on or after July 1, 2015, and elected a 50% JSA. *See* Defs.' App. in Supp. Opp'n Mem. at Ex. A (Abraham Report ¶ 38). Although Plaintiffs suggest these participants are speculative and hypothetical, Urbis has provided a declaration in support of Defendants' opposition brief stating she has reviewed American's corporate records and "determined that there are participants in the Plans who were born before November 1, 1941; retired on or after July 1, 2015; and, elected a 50% [JSA]." *Id.* at Ex. B (Urbis Decl. ¶ 3).

In addition, as previously explained, Plaintiffs' model proposes using a new, preferred mortality table to calculate the "Actuarial Equivalent" of a single life annuity under section 9.4(a) of the Plans—which Plaintiffs term a "horizontal" conversion—but retaining the existing UP-1984 mortality tables that appear in the Plans' current definition of "Actuarial Equivalent" when determining a participant's Late Retirement Benefit under section 7.3 of the Plans—which Plaintiffs term a "vertical" conversion. *See* Pls.' Reply 3, ECF No. 59. Even assuming, arguendo, that ERISA allowed Plans to use different conversion formulas when the Plans contain a defined term, the Court declines to adopt Plaintiffs' invitation to reform this defined Plan term to mean two different things in two different sections of the Plans. The Court agrees with Defendants' argument that:

> [T]he ERISA-based "reformation" remedy Plaintiffs seek must be consistent with ERISA and traditional equity principles, *see CIGNA Corp. v. Amara*, 563 U.S. 421, 443 (2011), and Plaintiffs' remedy would not be. Those principles preclude, under the guise of reformation, overriding the Plans' choice to use a single definition of "Actuarial Equivalence" and drafting two separate definitions—one that would conform to Plaintiffs' view of ERISA and one that, by Plaintiffs' own theory, would be unlawful.

Defs.' Suppl. Br. 1, ECF No. 72. The remedy Plaintiffs propose to avoid conflict in the class—i.e., overriding the Plans' decision to use a single, generally applicable definition of "Actuarially Equivalent" and replace it with two separate definitions that apply to different benefits—also undermines "ERISA's principal function: to 'protect contractually defined benefits.'" *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 100 (2013) (citation omitted).[9]

Because the relief Plaintiffs seek, if consistently applied, would harm some class members they seek to represent, a fundamental conflict prevents the representative Plaintiffs from representing the class.   For these reasons, the Court denies Plaintiffs' Motion for Class Certification. "Numerous courts have held that intraclass conflicts may negate adequacy under Rule 23(a)(4)." *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 315 (5th Cir. 2007) (vacating grant of class certification where plaintiffs' theory would benefit some class members but harm others because, among other things, the challenged stock fund "cannot be partially shut down for the litigating Plaintiffs and remain open for absent class members who desire this investment option"); *see also Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1190 (11th Cir. 2003) ("To our knowledge, no circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class." (collecting cases)).

---

[9] In addition, the gravamen of Plaintiffs' claim is that the UP-1984 table is unreasonable and antiquated and thus does not yield actuarial equivalence. Plaintiffs do not make clear to the Court why continuing to use this same outdated table to calculate late retirement benefits would not be similarly problematic.

### 2. *Using Alternative Discount Rates to Fashion Relief*

Defendants also maintain the representative Plaintiffs are not adequate representatives under Rule 23(a)(4) because the use of alternative discount rates to fashion relief, as proposed by Dr. Serota, would harm some class members they purport to represent. Both Dr. Serota and Abraham agree that some members of the proposed class, those who select a JSA, would benefit from a higher discount rate (and be harmed by a lower one), and that some members of the proposed class, those who opt for a CLA, would benefit from a lower discount rate (and be harmed by a higher one). *See* Defs.' App. in Supp. Opp'n Mem. at Ex. A (Abraham Report ¶ 52); Needham Decl. at Ex. 15 (Serota Decl. at 19). Because of this tension, the Court concludes that the representative Plaintiffs may not urge any particular discount rate without compromising the interest of some of the proposed class members relative to other rates that Plaintiffs propose. Although Plaintiffs suggest a subclass of those participants who opted for a CLA rather than a JSA in the event the Court finds the conflict more than minimal, Plaintiffs have not provided the Court with any evidence that such a subclass would independently satisfy the requirement of Rule 23. *See Simms v. Jones*, 296 F.R.D. 485, 499 (N.D. Tex. 2013) (Lynn, J.), *aff'd sub nom. Ibe v. Jones*, 836 F.3d 516 (5th Cir. 2016) ("When class certification is sought for multiple subclasses, each individual subclass is treated as its own class and must meet the requirements of Rule 23." (citation omitted)).

Because the putative class members have conflicting interests as to the discount rate used to calculate benefits under the model proposed by Dr. Serota, the representative Plaintiffs are not adequate representatives of the class they seek to represent. For this alternative reason, the Court denies Plaintiffs' Motion for Class Certification.

### B. Rule 23(b)—Class Action Prerequisites

Although Plaintiffs' failure to satisfy Rule 23(a)(4) defeats class certification, the Court concludes that Plaintiffs separately have not satisfied either Rule 23(b)(1)(A) or Rule 23(b)(2), providing an independent basis for denying class certification.

"To obtain class certification, parties must satisfy Federal Rule of Civil Procedure 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)." *Cruson*, 954 F.3d at 252. Plaintiffs seek to certify the class pursuant to either Rule 23(b)(1)(A) or Rule 23(b)(2). Rule 23(b)(1)(A) is satisfied where "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." FED. R. CIV. P. 23(b)(1)(A); *see also* 2 NEWBERG ON CLASS ACTIONS § 4:2 ("The 23(b)(1) class action is both the most organic form of the class action and the least utilized. This may seem like a paradox, but in fact, it makes some sense. The 23(b)(1) class action is the most organic form of aggregate litigation because when 23(b)(1) circumstances are present, unitary adjudication is perceived as not only preferable but essential as well." (footnotes omitted)).

In support of certification under Rule 23(b)(1)(A), Plaintiffs assert that in "the absence of class certification [under Rule 23(b)(1)(A)], multiple participants in the three different plans could challenge Defendants' benefits calculations, resulting in multiple, inconsistent determinations of whether the Plans' actuarial assumptions were reasonable and what assumptions should be used instead." Pls.' Mem. Supp. Mot. Class Cert. 18, ECF No. 51. As the Court previously discussed in assessing Rule 23(a)(4), the relief that the representative Plaintiffs seek is not appropriate for the class as a whole. While the pension benefits of the representative Plaintiffs would increase if the

Plans used a more recent mortality table reflecting longer life expectancies, the same is not true for absent class members who were born before November 1, 1941, retired on or after July 1, 2015, and elected a 50% JSA. As Defendants correctly note, "[t]here is no risk that certain absent class members would bring suit absent class certification because they are better off in the world that exists today." Defs.' Opp'n Mem. 15, ECF No. 57 (quoting The Late Charles A. Wright et al., 7A FED. PRAC. & PROC. § 1773 (3d ed. 2018) ("[T]here obviously must be a risk that separate actions will in fact be brought if a class action is not permitted.")). Accordingly, the Court concludes that Plaintiffs have not satisfied the requirements of Rule 23(b)(1)(A).

Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2); *see also Dukes*, 564 U.S. at 360 ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." (internal quotation marks and citation omitted)).

Citing Rule 23(b)(2), Defendants contend, "[i]t follows a fortiori that Rule 23(b)(2) does not authorize class certification where some of the absent class members would have to be spared from any injunction or declaration just to avoid being harmed." Defs.' Opp'n Mem. 14, ECF No. 57. The Court agrees. Equitable relief in such a circumstance, by definition, is not "appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2); *see Langbecker*, 476 F.3d at 315 (doubting propriety of 23(b)(2) certification where some absent class members would be harmed by the relief sought by named plaintiffs); *Gonzales v. City of Albuquerque*, No. CIV 09–0520 JB/RLP, 2010 WL 4053947, at *18 (D.N.M. Aug. 21, 2010) ("The pecuniary conflict of interest

between the Plaintiffs and current employees renders the injunctive relief inappropriate for all current employees."); *Rogers v. U.S. Dep't of Hous. & Urban Dev.*, 96 F.R.D. 149, 151 (N.D. Cal. 1982) (noting "the court's heightened obligation to protect the interest of absent class members in class actions brought under Rule 23(b)(2)" in finding that a conflict of interest defeated adequacy).[10]

For the above-stated reasons, the Court concludes that Plaintiffs have not satisfied the requirements of Rule 23(b)(1)(A).

## IV.  CONCLUSION

Based on the foregoing, the Court determines (i) the representative Plaintiffs have not satisfied their burden of showing they are adequate class representatives under Federal Rule of Civil Procedure 23(a)(4); and (ii) as the representative Plaintiffs' claims, if successful, would harm some class absent members, the representative Plaintiffs fail to satisfy the elements of either Federal Rule of Civil Procedure 23(b)(1)(A) or Federal Rule of Civil Procedure 23(b)(2). Accordingly, the Court **DENIES** Plaintiffs' Motion for Class Certification, ECF No. 50.

**SO ORDERED** on this **22nd day** of **May, 2020**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

---

[10] In their reply brief, Plaintiffs state that "[s]ince there has been no objection to certification of [Counts One and Three], the Court should certify them. Pls.' Reply 1 n.1, ECF No. 59. Plaintiffs' suggestion fails to take into account that a district court's obligation to conduct a rigorous analysis of Rule 23's requirements is not dispensed with by a party's stipulation to class certification or failure to challenge any certification requirements. *See Ward*, 753 F. App'x at 244. Further, the parties seeking class certification "bear the burden of proof to establish that the proposed class satisfies the requirements of Rule 23." *Stukenberg*, 675 F.3d at 837 (5th Cir. 2012). Plaintiffs have not provided the Court with any separate analysis regarding certification of Counts One and Three that persuades the Court to reach a different result as to these counts than the result reached with respect to Count Two. In any event, although recognizing Defendants' primary challenge is with respect to Count Two, the Court construes Defendants' challenge to the proposed class more broadly than Plaintiffs construe it, as Counts One through Three are intertwined.